UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**DIANA HINOJOSA-SCHROETER,**

    **Plaintiff,**

v.                                                   Case No. SA-19-CV-01297-JKP

**JOHN E. WHITLEY, Acting Secretary
Department of the Army,**

    **Defendant.**

### MEMORANDUM OPINION AND ORDER

Before the Court is a motion for summary judgment filed by Defendant John Whitley (ECF No. 27). With the filing of the response (ECF No. 30) and reply (ECF No. 32), the motion is ripe for ruling. For the reasons set forth below, the Court grants the motion.

### I. BACKGROUND

Plaintiff Diana Hinojosa-Schroeter is a former federal civilian probationary employee at Brook Army Medical Center, Fort Sam Houston, Texas. On October 31, 2019, Mrs. Hinojosa-Schroeter filed this action asserting causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 2000e-16 and Texas state law. Her complaint alleged that her first- and second-level supervisors discriminated against her because of her race and sex and retaliated against her for reporting the alleged discrimination. *See* Pl. Original Compl., ECF No. 1 at 1-2. She further alleged that her first-level supervisor verbally abused her after she reported his alleged misconduct. *Id.*

On September 25, 2020, this Court partially granted Defendant's motion to dismiss, dismissing Plaintiff's intentional infliction of emotional distress claim and allowing her discrimination and retaliation claims to proceed. ECF No. 21 at 12. Plaintiff subsequently

1

withdrew her discrimination claim. *See* ECF No. 30 ¶ 10; ECF No. 30-1, Pl.'s Dep. 24:21–24 ("Q. You have dropped your claims for discrimination and harassment, leaving only the claims for retaliation. Is that correct? A. Yes."). On March 18, 2021, Defendant filed a motion for summary judgment on Plaintiff's remaining claim for retaliation. ECF No. 27. The motion is ripe and pending before the Court.

## II. LEGAL STANDARD

A court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material," and a fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact becomes "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Because there must be a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. There is no genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When a party moves for summary judgment on claims on which the opposing parties will bear

---

[1] Although 2010 amendments replaced "issue" with "dispute," the summary judgment standard "remains unchanged." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.).

the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovants' claims." *Armas v. St. Augustine Old Roman Catholic Church*, No. 3:17-CV-2383-D, 2019 WL 2929616, at *2 (N.D. Tex. July 8, 2019) (citing *Celotex Corp.*, 477 U.S. at 325).

In determining the merits of a motion for summary judgment, a court must view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). Further, a court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Anderson,* 477 U.S. at 254–55.

If the movant carries its initial burden, the burden shifts to the nonmovant to present competent summary judgment evidence showing the existence of a genuine dispute of material fact. *Matsushita*, 475 U.S. at 586-87; *see also* Fed. R. Civ. P. 56(c). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports its claim. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.; see also RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). If the nonmoving party fails to make a showing sufficient to establish the existence of an element

essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322–23.

### III. APPLICABLE LAW

The anti-retaliation provision of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3(a)) makes it unlawful for an employer to discriminate against an employee because the employee "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in any manner in [a Title VII] investigation, proceeding, or hearing." § 2000e-3(a). Title VII retaliation claims are proved "according to traditional principles of but-for causation," which require "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360-362 (2013); *see Babb v. Wilkie*, 140 S. Ct. 1168, 1176 (2020) (observing that in *Nassar*, the Court "interpreted Title VII's anti-retaliation provision, 42 U. S. C. §2000e-3(a), as requiring retaliation to be a but-for cause of the end result of the employment decision").

Title VII retaliation claims are proved "by direct or circumstantial evidence." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). In the absence of direct evidence of discrimination, courts "apply the burden-shifting framework" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792. (1973). *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021); *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 948 (5th Cir. 2015); *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005). This framework applies both at trial, *McDonnell*, 411 U.S. at 802, and at summary judgment, *Vaughn v. Woodforest Bank*, 665 F.3d 632, 635-36 (5th Cir. 2011).

To survive a defendant's motion for summary judgment under the *McDonnell Douglas* framework, prior to the assignment of summary judgment burdens of proof, a plaintiff must, first,

establish a prima facie case of the asserted retaliation. *McCoy*, 492 F.3d at 556-57. A prima facie case in the retaliation context requires the plaintiff to establish: (1) participation "in an activity protected by Title VII"; (2) "an adverse employment action" by the employer; and (3) "a causal connection exists between the protected activity and the adverse employment action." *McCoy*, 492 F.3d at 556-57; *accord Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016). The third element of the prima facie case requires only that the plaintiff establish "a causal link between the protected activity and [the adverse action]." *Watkins*, 997 F.3d at 284. This "burden of causation" can be met "simply by showing close enough timing between [the] protected activity and [the] adverse employment action." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020), *as revised* (Aug. 14, 2020) (citing *Garcia v. Prof'l Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019)).

Carrying this initial burden creates an inference or presumption of retaliation. *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427 (5th Cir. 2017). Once the plaintiff makes a prima facie case of retaliation, the burden shifts to [the defendant] to proffer a legitimate, nonretaliatory reason for [the adverse action]." *Watkins*, 997 F.3d at 284. If the employer satisfies its burden, "the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose." *McCoy*, 492 F.3d at 557. Pretext may be proven with "any evidence that casts doubt on the credence of that reason." *Watkins*, 997 F.3d at 284. "A reason is unworthy of credence if it is not the real reason for the adverse employment action." *Id.*

"[T]o survive a motion for summary judgment, a plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the adverse employment action but for the protected activity." *Brown*, 969 F.3d at 577 (citing *Musser v. Paul*

*Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019) (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012))) (internal quotation marks omitted). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* (quoting *Musser*, 944 F.3d at 561-62).

## IV. DISCUSSION

On August 8, 2016, Plaintiff was given a career conditional appointment to the position of Supervisory Nurse in Interventional Radiology in the Department of Radiology, GS-12, at Brooke Army Medical Center (BAMC). ECF No. 27-5. Her original job offer included a one-year probationary period. ECF No. 27-7. As part of the 2016 National Defense Authorization Act, civilian employees appointed after November 25, 2015 to a permanent position within the competitive service at the Department of Defense (of which BAMC is a part), began serving a two-year probationary period as of the date of their appointment.[2] Accordingly, on November 22, 2016, U.S. Army Medical Command issued a corrected SF50 (personnel action) showing Plaintiff was subject to a two-year probationary period. ECF No. 27-11 (Blocks 45, 49). Plaintiff was terminated as of July 7, 2018, one month short of the expiration of her probationary period. ECF No. 27-6.

Plaintiff contends she was terminated in retaliation for filing claims of discrimination and retaliation, activities protected by Title VII. As recited above, to prevail at summary judgment, Plaintiff must make a prima facie case; if made, Defendant must produce a legitimate, nonretaliatory reason for her termination; if produced, Plaintiff must establish, or "show a conflict in substantial evidence," that she would not have been terminated but for her protected activity.

---

[2] The Act provides, in pertinent part: "The amendment made by subsection (a) [adding § 1599(e)] shall apply to any covered employee (as that term is defined in section 1599e of title 10, United States Code, as added by such subsection) *appointed after the date of the enactment of this section*." National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, § 1105, 129 Stat. 726 (Nov. 25, 2015) (emphasis added).

*Brown*, 969 F.3d at 577.

Plaintiff establishes all three elements of her prima facie case. Plaintiff participated in Title VII protected activities when she complained of workplace violence on March 14 and March 21, 2018, and discrimination on April 5, 2018. ECF Nos. 27-10 at 2; 30-1 at 102, 114; 30-2 at 3. Thus, her complaints, made verbally and by email to her second-level supervisor Col. Michael Clemenshaw (Clemenshaw) and in formal documents, establish the first element. Plaintiff established the second element because her first-level supervisor, LTC Steven H. Craig (Craig), terminated her employment. ECF Nos. 27-6; 30-3 at 7. And she establishes the third element with evidence that (i) Craig inquired into her probationary status on April 6, 2018 (the day after he was cleared of the work place violence complaint); (ii) after Craig learned (incorrectly) that Plaintiff's probationary period had passed, he cast about for another legitimate reason to terminate her employment (e.g., soliciting from her staff negative comments about Plaintiff, instigating a "sensing session" to garner support for his opinion that Plaintiff could not get along with, and was indeed bullying her staff); and (iii) shortly after he discovered her probationary period had not actually passed, terminated her for conduct he had ratified for over a year. ECF Nos. 27-10 at 3; 27-14 at 4, 6; 27-26; 27-29; 30-2 at 16; 30-16 at 4; 30-3 at 9. This evidence allows the Court to infer a causal link between Plaintiff's protected activity and her termination. This inference establishes the third element.

Defendant's burden to produce a legitimate, nonretaliatory reason for Plaintiff's termination is met with the notice of termination attached to its motion. Signed by Craig, the notice states, in pertinent part:

> You began employment in this organization on 08 August 2016 on a career conditional appointment, subject to satisfactory completion of a two (2) year probationary period. The purpose of a probationary period is to allow the Agency

7

>an opportunity to assess on the job performance, overall qualifications, suitability, aptitude, attendance, cooperativeness and conduct of an employee.
>
>During the probationary period, you failed to exemplify the desired conduct of a federal employee. During a review of your timecard, over 200 premium hours were credited to you as comp time or overtime. However, you failed to request prior approval from your supervisor to earn comp time or overtime in accordance with BAMC Policy Memorandum 690-[1]. You are in a position of confidence and trust and are expected to conduct yourself in a manner conducive with your position.
>
>I have concluded your termination would serve in the best interest of the federal government and promotes the efficiency of the service. As a probationary employee, you do not have the right to reply to this action.

ECF No. 27-6 at 4.

Thus, Plaintiff must raise a genuine dispute as to whether Defendant's reason—Plaintiff put in for comp and overtime without receiving prior approval—is pretext for Title VII retaliation. The summary judgment record "casts doubt on the credence" of the proffered reason because the evidence strongly suggests that putting in for comp and overtime without prior approval was not the "real reason" Craig fired Plaintiff. *Brown*, 969 F.3d at 578.

First, the record reflects that Defendant was not "aware of anyone other than Plaintiff" who had been "disciplined or terminated for failure to obtain written pre-approval of [o]vertime for the past [three] year period." ECF No. 30-3 at 6. Because the record also shows that other employees had put in for comp and overtime without strictly adhering to the policy that was the basis for Plaintiff's termination, this supports Plaintiff's contention that but for her protected activity, she would not have been fired.

Second, Plaintiff testifies to a good faith belief her comp and overtime were pre-approved based on:

(1) the provision of Government issued Blackberry and laptop (requested and approved by her second-level supervisor)—ostensibly because her position as "CNOIC/Nurse Supervisor"

required "24/7 contact" and "constant communication . . . at all times with different nurse's shifts and on-call [nurses]"—indicates that her supervisors knew that work outside the clinic was necessary to complete the requirements of her position (ECF Nos. 27-8; 27-13 at 18-19; 30-1 at 38, 134; 30-2 at 18; 30-21);

(2) the general knowledge of her supervisors and her staff that she often stayed late or worked from home (ECF Nos. 27-1 at 14-15, 26-28; 27-1 at 2-3; 27-13 at 18; 27-17 at 2-3; 30-1 at 38, 144; 30-2 at 17-20, 134; 30-3 at 4-5, 9; 30-5 at 4-5; 30-8 at 11 (in which in her December 2017 evaluation, completed with Craig, Plaintiff states, "I have been working extra hours just to keep up with my responsibilities and working from home on weekends"); 30-10 at 4; 30-24 at 3);

(3) her assignment to 24/7 "on-call" status, —*i.e.*, Plaintiff's name was on "the board" as the person to call anytime a nurse was needed, and Plaintiff was required to find a replacement or go in herself, thus, if such a call came in, she would necessarily be working from outside the clinic (ECF Nos. 30-1 at 34, 51-54; 30-2-at 18);

(4) the requirement that Plaintiff enter on her timecard the hours, the type (such as premium, comp, or overtime), and the reason (such as "worked late" or "MFR/CPAC Meeting"), the timecard was then reviewed and approved by an employee authorized to do so (ECF Nos. 27-4 at 2; 30-6 at 6; 30-23; 32-1 at 4);

(5) the different requirements supervisors had for employees to request approval for comp or overtime, —*e.g.,* Craig verbally approved requests for comp and overtime and Clemenshaw required Form 1256 (ECF Nos. 27-13 at 30 (Craig); 30-16 at 5 (Clemenshaw); 27-17 at 3 (supervisor approving comp time either before or after the work was completed); 30-2 at 20 ("MAJ Buck never had them do the forms either"); 30-10 at 4 (Interim Chief Hoffman stating, "I knew at time she did work at home on nights and/or weekends but we never discussed hours or of an

9

approval process"); 30-3 at 4-5 (Defendant "cannot verify whether [Armando] Ramirez submitted signed Form 1256(s)" when seeking comp or overtime approval); 32-2 at 4 (Clemenshaw knew that Dr. Tucker regularly put in for overtime and that he did not fill out Form 1256, and Clemenshaw did not know if Dr. Tucker requested pre-approval, in any event they knew he had to do work outside of his regular hours to complete the requirements of his job); 32-2 at 3 (Clemenshaw discovered "potential inconsistencies with premium hour approval");

(6) the absence of counseling on the matter—*e.g.*, when one of Plaintiff's nurses did not request pre-approval for admin overtime (as opposed to patient care overtime), Plaintiff counseled her—conversely, when Plaintiff put in for admin comp or overtime, no one counseled her, thus, she assumed there was no issue with her input for comp or overtime for admin work (particularly as she was a supervisor whose primary job was administrative) (ECF Nos. 30-1 at 62-65, 133-40; 30-2 at 17); in fact, over Plaintiff's entire tenure, none of her supervisors (Craig, Clemenshaw, Dr. Howard Hoffman, MAJ Tanesha Lindsay), ever counseled her against putting in for comp or overtime—to the contrary—when Plaintiff worked late, Lindsay sometimes told Plaintiff to go home and sometimes told her to request comp time (ECF Nos. 27-1 at 14-15, 26-28; 27-3 at 2-4; 30-2 at 19);

(7) BAMC Policy Memorandum 690-1, which requires supervisors "to coordinate with their administrative officer to monitor the burn rate on OT to ensure OT is not approved without sufficient funds" (ECF No. 27-16 at 20) and neither her first- or second-level supervisor ever discussed this topic with Plaintiff, individually;

(8) the action taken by BAMC when it realized that peers were approving each other's comp and overtime—it changed its policy—the new policy eliminates Form 1256, puts the onus on Department Chiefs to remain within overtime "budget targets," and provides reports that track

overtime spending at the Deputy and Department level; when Clemenshaw discovered "the potential inconsistencies with premium hour approval" he "directed the Departmental Physician Leaders to have AATAPS (timecard system) access and approve requests for their Civilian Supervisors"—*i.e.*, "the AATPS system was changed so that only an employee's supervisors, not a peer, could approve premium time requests" (ECF Nos. 30-12; 32 at 4; 32-2 at 3).

The knowledge, common to all of her supervisors, that Plaintiff worked long hours and worked from home, combined with the other evidence cited above, lends credence to Plaintiff's contention that she was not fired because of any failure to abide by BAMC Policy Memorandum 690-1.

Third, because the "pre-approval" for comp or overtime could be verbal, a jury would necessarily have to make credibility assessments of the testimony as to whether Plaintiff requested and Craig gave prior approval to put in for comp or overtime. EFC Nos. 30-1 at 139-40; 30-3 at 4-5, 9 (in which Craig remembers giving Armando Ramirez prior approval each time Ramirez requested approval for comp or overtime, but doesn't remember approving any request Plaintiff might have made). Because "[c]redibility determinations . . . are within the province of the fact-finder" this evidence supports Plaintiff's contention that she can show a conflict in substantial evidence as to whether the reason given for firing her was mere pretext. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991).

Fourth, Craig had expressed his frustration with Plaintiff (March 2018); asked whether she was on probationary status (April 2018); and requested a sensing session because Plaintiff couldn't get along with and was bullying her staff (May 2018) before he was made aware that he could terminate her under the prior approval policy for comp and overtime (June 2018). ECF Nos. 30-6 at 6. It was not until June 25, 2018, that MSGT Harris was asked to look into Plaintiff's "premium

hours" (comp and overtime) and by July 2, 2018, Craig used that information to fire her. ECF Nos. 27-13 at 16; 30-6 at 6. This evidence lends further support to Plaintiff's argument that the reason given in the termination letter is unworthy of credence. Moreover, Defendant's briefing spills much ink explaining the many *other* reasons that Plaintiff's performance was substandard. Defendant's briefing also expends energy pointing to evidence, which shows that under Craig's leadership, Plaintiff was, simply, a bad fit. *See generally* ECF Nos. 27; 32 (highlighting Plaintiff's conflicts with Craig and the many "subordinate complaints" against her).

As to the reason stated in her termination letter, to wit: "you failed to request prior approval from your supervisor to earn comp time or overtime in accordance with BAMC Policy Memorandum 690-[1]," Plaintiff has met her burden to show pretext. ECF No. 27-6 at 4. However, while it appears the reason given in the termination letter was pretext, the record establishes other, nonretaliatory reasons for Plaintiff's termination. Of note, excepting the grounds for appeal stated in 5 C.F.R. § 315.806, Craig could have fired Plaintiff during her probationary period for any reason or no reason. Thus, Plaintiff cannot show that but for her protected conduct, she would not have been fired. *See* 10 U.S.C. 1599e; *Barr v. MSPB*, 792 F. App'x 939, 941 (Fed. Cir. 2019) (observing that probationary employees "are generally excluded from the category of federal employees entitled to appeal to the [Merit Systems Protection] Board"); *Christian v. N.Y. State Dep't of Labor, Div. of Emp't*, 414 U.S. 614, 631 n.4 (1974) (noting that under 5 C.F.R. § 315.806, "a probationary federal employee has no right to appeal a discharge, and is only entitled to a hearing on the basis of claims that the discharge resulted from discrimination based on race, color, religion, sex, political persuasion, marital status, or physical handicap, or that the procedure used violated 5 C.F.R. § 315.805").

The summary judgment evidence establishes that Craig and Plaintiff's personalities and leadership styles clashed from the start. For example, in the declaration made during the investigation into Plaintiff's equal employment opportunity discrimination complaint Craig states that shortly after he "took over" in May 2017, he had "multiple nurses crying in [his] office complaining about [Plaintiff]." ECF No. 27-13 at 12. In his declaration, Craig relayed his disagreement with Plaintiff's management style, describing Plaintiff's interactions with her staff in July, August, and November 2017 and March and April 2018, that he would have handled differently. *Id.* at 12-13.

In October 2017, Craig and Plaintiff disagreed about Plaintiff's staff evaluations; in January 2018, they conflicted over the call-swap policy and Plaintiff's response to her staff's tardiness; in February and March 2018, they again disagreed over Plaintiff's approach to staff tardiness; and in March 2018, Plaintiff blanched at her performance appraisal, accusing Craig of submitting "erroneous statements." ECF No. 27-10 at 3; *see also* ECF No. 27-13 at 5-8. A memorandum written contemporaneously with the investigation into the workplace violence complaint filed by Plaintiff on March 21, 2018, contains this statement from Craig:

> I do not recall any event which could be construed as workplace violence. Communication between Ms. Hinojosa-Schroeter and myself is strained. We have very different leadership styles and disagree on several issues related to the supervision and management of our employees. Ms. Hinojosa-Schroeter perceives this as lack of support. Ms. Hinojosa-Schroeter's leadership style is very authoritative. I have received many complaints from employees who she supervises. They feel that they are being harassed or bullied. Several have resigned, retired early, or asked for reassignment to another section as a result of their interactions with Ms. Hinojosa-Schroeter. I believe that there are others that are unwilling to come forward for fear of reprisal. I have made several attempts to coach, mentor, and teach Ms. Hinojosa-Schroeter, but she is very resistant to change. Attempts to encourage her to change her behavior are met with extreme defensiveness. She insists that her actions are "by the book[.]" I have made every attempt to support her as a leader. I have attempted to handle disputes with the nursing staff at the section level. I will continue to support Ms. Hinojosa-Schroeter to the best of my ability given our strained professional relationship.

ECF No. 27-26 at 2-3 (Wilmer Matamoros, Memorandum for Record).

Plaintiff's awareness of Craig's dissatisfaction with her performance is expressed in her April 5, 2018 email, in which she recites conflict with Craig in March of that year and comments, "I am [four] months away from meeting my two year probationary period and I am fearful of being fired with no substantiated reason." ECF No. 27-28 at 2-3. But the record is replete with substantiated reasons to terminate Plaintiff's employment during her probationary period, most of which (as evidenced by her email) occurred before she filed her complaints. As the civil service regulations reflect, the purpose of a probationary period is "to determine the fitness of the employee" and allow her to "demonstrate fully [her] qualifications for continued employment." 5 C.F.R. § 315.803. If she fails to do so, the regulations require that the agency terminate the employee before the expiration of the probationary period. *Id.* The undisputed summary judgment evidence demonstrates Craig had a nonretaliatory reason for terminating Plaintiff's employment: Craig terminated Plaintiff, during her probationary period, because he determined she was not a good fit for continued employment. Although Craig did not need a reason to terminate Plaintiff during her probationary period, this reason was not unlawful.

Upon the evidence presented, Plaintiff cannot meet her burden to establish a "conflict in substantial evidence on the question of whether the employer would not have taken the adverse employment action but for the protected activity." *Brown*, 969 F.3d at 577. Stated differently, the summary judgment evidence does not establish that Craig would not have fired Plaintiff but for her protected activity. Moreover, upon all of the evidence presented, a reasonable jury could not find unlawful retaliation from the falsity of the explanation provided in Plaintiff's termination letter. The evidence clearly shows that after he assumed leadership in May 2017 and before Plaintiff lodged her complaints in March 2018, Craig believed Plaintiff was not a good fit for the

organization, and during a probationary period that is reason enough to terminate an employee. *See* 5 C.F.R. § 315.803.

## V. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant's motion for summary judgment. A separate final judgment will issue contemporaneously herewith.

**It is so ORDERED this 7th day of December 2021.**

_____
**JASON PULLIAM
UNITED STATES DISTRICT JUDGE**